

FILED
2012 Jul-09  AM 11:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **DONNELL FITZGERALD PETERSON,** ) | |
| ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action Number |
| **vs.** ) | **2:11-cv-02480-AKK** |
| ) | |
| **MICHAEL J. ASTRUE,** ) | |
| **COMMISSIONER OF SOCIAL** ) | |
| **SECURITY** ) | |
| **ADMINISTRATION,** ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

Plaintiff Donnell Fitzgerald Peterson ("Peterson") brings this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act ("the Act"), 42 U.S.C. § 405(g) and §1383(c)(3), seeking review of the final adverse decision of the Commissioner of the Social Security Administration ("SSA"). This Court finds that the Administrative Law Judge's ("ALJ") decision - which has become the decision of the Commissioner - is supported by substantial evidence, and, therefore, **AFFIRMS** the decision denying benefits.

### I. Procedural History

Peterson filed his application for Disability Insurance Benefits and Title XVI Supplemental Security Insurance on September 19, 2007, alleging a disability

onset date of January 1, 2007, from "systemic lupus erythematosus ["SLE"] with discoid lesions, hypertension, anxiety disorder NOS, panic disorder without agoraphobia, dysthymia, history of bipolar disorder, and history of polysubstance dependence." (R. 18). After the SSA denied his application, Peterson requested and received a hearing on June 16, 2009. (R. 26-63, 83). At the time of the hearing, Peterson was 44 years old with a high school diploma and two years of college. (R. 31). Peterson's past relevant work included work as a mail handler, park worker, and a trash collector. (R. 55).

On August 17, 2009, the ALJ denied Peterson's claim. (R. 16-25). The ALJ found that Peterson has SLE with discoid lesions, hypertension, anxiety disorder NOS, panic disorder without agoraphobia, dysthymia, history of bipolar disorder, and history of polysubstance dependence. (R. 18). The ALJ found also that Peterson cannot perform any past relevant work, but that he has a residual functional capacity ("RFC") to perform light work with limitations. (R. 21, 24). On May 9, 2011, the Appeals Council refused to grant review. (R. 1-3). Peterson then filed this action for judicial review pursuant to 42 U.S.C. § 405(g). Doc. 1.

## II.  Standard of Review

The only issues before this court are whether the record contains substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the ALJ applied the

correct legal standards, *see Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988);

*Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Title 42 U.S.C. §§ 405(g)

and 1383(c) mandate that the Commissioner's "factual findings are conclusive if

supported by 'substantial evidence.'" *Martin v. Sullivan*, 894 F.2d 1520, 1529

(11th Cir. 1990). The district court may not reconsider the facts, reevaluate the

evidence, or substitute its judgment for that of the Commissioner; instead, it must

review the final decision as a whole and determine if the decision is "reasonable

and supported by substantial evidence." *See id.* (citing *Bloodsworth v. Heckler*,

703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a

preponderance of evidence; "[i]t is such relevant evidence as a reasonable person

would accept as adequate to support a conclusion." *Martin*, 849 F.2d at 1529

(quoting *Bloodsworth*, 703 F.2d at 1239) (other citations omitted). If supported by

substantial evidence, the court must affirm the Commissioner's factual findings

even if the preponderance of the evidence is against the Commissioner's findings.

*See Martin*, 894 F.2d at 1529. While the court acknowledges that judicial review

of the ALJ's findings is limited in scope, it notes that the review "does not yield

automatic affirmance." *Lamb*, 847 F.2d at 701.

### III. Statutory and Regulatory Framework

To qualify for disability benefits, a claimant must show "the inability to

engage in any substantial gainful activity by reason of any medically determinable physical or mental impairments which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 416(I).  A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrated by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

Determination of disability under the Act requires a five step analysis. 20 C.F.R. § 404.1520(a)-(f).  Specifically, the Commissioner must determine in sequence:

(1)    whether the claimant is currently unemployed;

(2)    whether the claimant has a severe impairment;

(3)    whether the impairment meets or equals one listed by the Secretary;

(4)    whether the claimant is unable to perform his or her past work; and

(5)    whether the claimant is unable to perform any work in the national economy.

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).  "An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability.  A negative answer to any question, other than step three, leads to a determination of 'not disabled.'"  *Id*. at 1030 (citing 20

C.F.R. § 416.920(a)-(f)).  "Once a finding is made that a claimant cannot return to prior work the burden shifts to the Secretary to show other work the claimant can do." *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995) (citation omitted).

Lastly, where, as here, Peterson alleges disability because of pain, he must meet additional criteria.  In this circuit, "a three part 'pain standard' [is applied] when a claimant seeks to establish disability through his or her own testimony of pain or other subjective symptoms." *Holt v. Barnhart*, 921 F.2d 1221, 1223 (11th Cir. 1991).  Specifically,

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.[1]

*Id*.  However, medical evidence of pain itself, or of its intensity, is not required:

> While both the regulations and the *Hand* standard require objective medical evidence of a condition that could reasonably be expected to cause the pain alleged, neither requires objective proof of the pain itself.  Thus under both the regulations and the first (objectively identifiable condition) and third (reasonably expected to cause pain alleged) parts of the *Hand* standard a claimant who can show that his condition could reasonably be expected to give rise to the pain he alleges has established a claim of disability and is not required to produce additional, objective proof of the pain itself.  *See* 20 CFR §§ 404.1529 and 416.929; *Hale* at 1011.

*Elam v. R.R. Ret. Bd.*, 921 F.2d 1210, 1215 (11th Cir. 1991) (parenthetical

---

[1] This standard is referred to as the *Hand* standard, named after *Hand v. Heckler*, 761 F.2d 1545, 1548 (11th Cir. 1985).

information omitted) (emphasis added).  Moreover, "[a] claimant's subjective

testimony supported by medical evidence that satisfies the pain standard is itself

sufficient to support a finding of disability." *Holt*, 921 F.2d at 1223.  Therefore, if

a claimant testifies to disabling pain and satisfies the three part pain standard, the

ALJ must find him disabled unless the ALJ properly discredits his testimony.

Furthermore, when the ALJ fails to credit a claimant's pain testimony, the

ALJ must articulate reasons for that decision:

> It is established in this circuit that if the [ALJ] fails to articulate reasons for
> refusing to credit a claimant's subjective pain testimony, then the [ALJ], as
> a matter of law, has accepted that testimony as true.  Implicit in this rule is
> the requirement that such articulation of reasons by the [ALJ] be supported
> by substantial evidence.

*Hale v. Bowen*, 831 F.2d 1007, 1012 (11th Cir. 1987).  Therefore, if the ALJ either

fails to articulate reasons for refusing to credit the plaintiff's pain testimony, or if

the ALJ's reasons are not supported by substantial evidence, the court must accept

as true the pain testimony of the plaintiff and render a finding of disability.  *Id*.

## IV.  The ALJ's Decision

As a threshold matter, the court notes that the ALJ properly applied the five

step analysis.  Initially, the ALJ determined that Peterson had not engaged in

substantial gainful activity since January 1, 2007, and therefore met Step One.  (R.

15).  The ALJ acknowledged that Peterson's combination of severe impairments of

SLE with discoid lesions, hypertension, anxiety disorder NOS, panic disorder

without agoraphobia, dysthymia, bipolar disorder, and polysubstance dependence

met Step Two. *Id*. The ALJ proceeded to the next step and found that Peterson

did not satisfy Step Three since his impairments or combination of impairments

neither met nor equaled the requirements for any listed impairment. (R. 19).

Although he answered Step Three in the negative, consistent with the law, *see*

*McDaniel*, 800 F.2d at 1030, the ALJ proceeded to Step Four where he determined

that Peterson had the RFC to

> lift, carry, push, and/or pull 20 pounds occasionally and 10 pounds
> frequently; he can stand and/or walk six hours in an eight-hour day
> with normal breaks; and he can sit for six hours in an eight-hour day
> with normal breaks. The claimant cannot climb ladders, ropes, and
> scaffolds and he should avoid exposure to hazards (machinery,
> heights, and the like) in the work place. The claimant can remember,
> understand, and carryout simple instructions, but would have greater
> difficulty with sustained execution of more detailed and complex
> instructions. He can sustain attention and concentration for two-hour
> periods at a time; he can complete a normal workday at an acceptable
> pace and schedule; and he would not require excessive breaks. The
> claimant can be expected to miss one or two days a month due to
> exacerbation of psychiatric symptoms. The claimant can
> appropriately manage casual and informal contact with the general-
> public, co-workers, and supervisors; his proximity with others should
> not be intensive or prolonged; and he may have difficulty interacting
> effectively with others when taxed or stressed. The claimant can
> accept and utilize supervision; respond to appropriate levels of
> feedback and constructive instructions; and he can respond to simple
> and infrequent changes in work routine.

(R. 21). Further, the ALJ held that Peterson could not perform any of his past

relevant work. (R. 24). Lastly, in Step Five, the ALJ considered Peterson's age,

education, work experience, RFC, and impairments, and determined that there are

a significant number of jobs in the national economy that Peterson can perform,

such as an assembler, sorter, and material handler.  (R. 24-25).  Because the ALJ

answered Step Five in the negative, the ALJ determined that Peterson is not

disabled.  (R. 25).

## V.  Analysis

The court turns now to Peterson's contentions that the ALJ failed to

properly consider the pain caused by his physical impairments and the opinion of

the Vocational Expert ("VE").  Doc. 10 at 9-10.  The court addresses each

contention below.

### A.   *The ALJ considered the entire record and properly applied the three-part pain standard.*

As it relates to Peterson's contention of disabling pain, the ALJ found that

Peterson's "medically determinable impairments could reasonably be expected to

cause the alleged symptoms."  (R. 22).  However, the ALJ found also that

Peterson's "statements concerning the intensity, persistence and limiting effects of

these symptoms are not credible to the extent they are inconsistent with the . . .

[RFC] assessment."  *Id*.  Peterson disagrees and contends that the "ALJ

concentrated primarily on [Peterson's] mental impairments as the basis for his

RFC findings" and that "the pain and fatigue documented in connection with his

lupus treatment are significant and should have been considered under the Eleventh Circuit pain standard." Doc. 10 at 14. Moreover, Peterson contends that "[w]hile the ALJ provided an extensive rationale for his findings as to Plaintiff's mental impairments, he virtually discounted that the . . . pain, fatigue, and other symptoms from SLE would have a limiting effect."[2] Based on the court's review of the entire record, the court finds that the ALJ properly applied the pain standard and that his decision is supported by substantial evidence.

As a threshold matter, the court notes that subjective complaints of pain alone are insufficient to prove disability. *See* 20 C.F.R. § 416.929(a); *see also Holt*, 921 F.2d at 1223. Rather, the pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain. *Id.* It is undisputed that Peterson has underlying medical conditions and, in fact, the ALJ found as such in Step Two. The disagreement centers on whether Peterson's conditions can be

---

[2]Peterson fails to cite the record nor does he discuss any evidence as to how his alleged pain and fatigue caused him more limitations than the ALJ's RFC. While "[i]t is well-established that the ALJ has a basic burden to develop a full and fair record[,] [n]evertheless, the claimant bears the burden of proving that he is disabled, and consequently, he is responsible for producing evidence in support of his claim." *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003) (citations omitted).

reasonably expected to cause the alleged pain Peterson claims.  In that respect, to support his contention that he suffers from disabling pain, Peterson alleges that he is unable to work on a regular basis because the SLE causes joint pain daily and that once a week the pain is so severe that it incapacitates him for three days.  (R. 42, 53).  Peterson further contends that the SLE causes his knees, ankles, and wrists to swell, (R. 54), pain in his groin and ankle,  (R. 42), and restricts him to being able to only sit two to three hours a day, stand thirty-five minutes at a time, lift ten pounds, and walk around a city block, (R. 43).

Unfortunately for Peterson, a review of the ALJ's opinion and the medical evidence shows that the ALJ properly considered the pain and fatigue documented in connection with Peterson's SLE.  Specifically, the ALJ noted initially that Peterson "has been diagnosed with [SLE] with discoid lesions, which causes generalized fatigue, photosensitivity, and arthralgias." (R. 18).  However, the ALJ then found that even though Peterson's medically determinable impairments could cause some of his symptoms, that Peterson's statements concerning the intensity and limiting effects were not credible to the extent they were inconsistent with the RFC.  (R. 22).  Moreover, the ALJ stated that "[i]n terms of [Peterson's] allegations as to the severity of his symptoms and limitations, the [ALJ] does not afford [Peterson's] statements full credibility and finds they are not supported by

the evidence of record," *id.*, specifically, Peterson's paid work activities, daily
activities, and records from the Veterans Administration Medical Center
("VAMC").

The ALJ's findings are supported by substantial evidence.  First, as it relates
to paid work, Peterson testified that his joint pain prevents him from working on a
regular basis and that he has not engaged in "substantial gainful activity" since the
January 1, 2007, alleged onset date.  (R. 18, 42).  Peterson added that he receives
$122.00 from the VA and $200.00 in food stamps monthly and that he has no
additional monthly income.  (R. 33).  However, the ALJ confronted Peterson with
statements Peterson made to his medical providers which contradicted Peterson's
contentions.  Specifically, on August 18, 2008, Peterson's treating physician at the
VAMC noted Peterson's report that Peterson worked as a handyman, was able to
perform most activities, and that his pain was doing "quite well."  (R. 408-09).
Additionally, on February 19, 2009, Peterson again reported to the VAMC that "he
works as a handyman and has been able to perform most activities.  He only
complains of occasional pain and some subjective feelings of instability while
walking on an uneven surface."  (R. 399).  Notably, Peterson also stated again that
"his pain is doing quite well . . . ." *Id.*  When the ALJ confronted Peterson with
this evidence, Peterson admitted that he "help[s] [his] cousin out every once in a

while when [his cousin] invites [Peterson] to help him" and he gets paid $20.00 to $40.00 depending on the job.  (R. 34-35).  In light of this evidence, the ALJ found correctly that "the evidence shows [Peterson] has continued to be involved with paid work activities that were not reported."  (R. 22).

While the ALJ noted correctly also that "[a]lthough [Peterson] engaged in work activity after his alleged onset date, [Peterson's] earnings did not exceed the threshold for substantial gainful activity,"  (R. 18), the Regulations are clear nonetheless that "work . . . that you have done during any period in which you believed you are disabled may show that you are able to work at the substantial gainful activity level."  20 C.F.R. § 404.1571.  In other words, although Peterson's work for his cousin may fall short of substantial gainful activity, the ALJ must still consider it, in addition to the medical and vocational evidence, to decide whether Peterson has the ability to engage in substantial gainful activity.

This is precisely what the ALJ did.  First, the ALJ relied, in part, on Peterson's Daily Activities Questionnaire in which Peterson stated that on an average day he is able to take short walks, handle personal business and needs (bathing, grooming, and dressing, on a regular basis), unless he is having severe joint pain, cook, take his medications, clean, watch television, read, shop for personal needs once a month, and watch and cooks for his sons on the weekends.

(R. 136-138).

Second, the ALJ relied also on the extensive medical evidence from the VAMC. In that regard, the evidence shows that on October 5, 2007, Peterson visited the VAMC with complaints of a rash and pain in the ankles, shoulders, knees, and fingers. (R. 214). The treating physician found no tenderness, effusions, or instability in Peterson's knees and no swelling or tenderness in his ankles. (R. 216). The physician also noted that Peterson's internal rotation of the shoulders was "well preserved." *Id.* The next visit to the VAMC occurred four months later when, on February 17, 2008, Peterson visited the VAMC emergency room for an ankle fracture he sustained when he jumped off a 30 foot ladder to avoid a moving tree limb. (R. 441). This visit was unrelated to the ailments Peterson claims makes him disabled and, in fact, supports the ALJ's findings as it shows that Peterson is capable of doing more than he claims. On April 3, 2008, Peterson visited the VAMC for a follow-up on his ankle and everything "on his x-rays . . . look[ed] in good position." (R. 428). The record is unclear whether the VAMC removed the cast on April 3 or earlier. In any event, four days later, on April 7, 2008, Peterson contacted the VAMC to report that his leg was still swollen and that he could not walk even though he was no longer in a cast. (R. 427). Notably, further undermining Peterson's contentions of disabling pain, six

months after Peterson fractured his ankle, on August 18, 2008, his treating VAMC physician stated that "[o]ver the interim he has returned to work; he works as a handyman and has been able to perform most activities."  (R. 408).

Peterson had four other visits to the VAMC for alleged pain due to his regular ailments.  The first occurred on July 25, 2008, during which the VAMC noted the Peterson had new and active discoid lesions in both arms, and several in his scalp.  (R. 417).  However, Peterson had no swelling or tenderness in the hands or elbows and no tenderness, effusions or instability in his knees.  *Id.*  The second visit occurred five months later when, on December 26, 2008, Peterson visited the VAMC emergency room complaining of a three day battle with joint pain, sore throat, cough, and cold.  (R. 407).  Critically, Peterson admitted he had not taken his medications for three days.  (R. 405).  The treating physician noted some mild inflamation in the finger joints, no effusion of elbows, knees, and ankles, and released Peterson the same day in stable condition.  (R. 405-06).  The third visit occurred on February 19, 2009, when Peterson returned to the VAMC for a follow-up visit during which he complained of occasional pain.  (R. 399).  Finally, Peterson visited the VAMC on February 27, 2009, complaining of eye irritation from paint flakes that flew in his eye while scraping paint.  (R. 390).

Based on the court's own review, the VAMC medical records support the

ALJ's findings that Peterson's allegations of pain are not supported by the medical evidence.  First, as to Peterson's contention that the ALJ "discounted that [Peterson's] pain, fatigue, and other symptoms from the SLE would have a limiting effect," doc. 10 at 10, the court disagrees because the ALJ had sufficient medical evidence to support his RFC determination and to discount Peterson's alleged limitations.  For example, while Peterson contends that the joint pain prevents him from working on a regular basis, the record shows that Peterson is able to work as a handyman.  (R. 408).  In fact, although it is unfortunate that Peterson fell from a 30 foot ladder, the accident shows that Peterson can climb a ladder to engage in work activity and belies his contention that he suffers from severe disabling joint pain.  Moreover, Peterson admitted also to engaging in daily activities (short walks, handling personal business, cooking, cleaning, and personal needs), (R. 136), that further support the ALJ's decision to discredit Peterson's contention of disabling pain.  Significantly, these activities are consistent with Peterson's statements to VAMC physicians on multiple occasions that he was doing "quite well."  (R. 399, 409).   In fact, the VAMC records contain no reports from Peterson that he is suffering from disabling pain or that he is unable to work because of pain.  Finally, as to Peterson's contention that the ALJ refused to consider his pain, the court notes that the ALJ placed additional

limitations on Peterson's light work RFC, i.e., no climbing of ladders, ropes, and scaffolds or exposure to hazards in the work place.  (R. 21).  Accordingly, the ALJ's RFC determination is supported by substantial evidence.

**B.**    ***The ALJ Properly Considered the Opinion of the Vocational Expert***

Peterson's final contention is that the ALJ failed to properly consider the opinion of the VE because "the ALJ's findings including the expectation that Plaintiff would miss one to two days per month due to exacerbation of psychiatric symptoms would rule out the unskilled representative occupations cited by the ALJ."  Doc. 10 at 10.  Moreover, Peterson contends that "based on the medical evidence of record and testimony, his absences would exceed this acceptable level and he would thus be incapable of performing continuous SGA."  *Id*.  Notably, Peterson fails to cite any medical evidence or testimony to support his contention that he would miss more than two days the ALJ presented in his hypothetical to the VE.  In the ALJ's hypothetical, the ALJ asked the VE to consider whether an individual, who in addition to other limitations, "may be expected to miss one or two days per month due to exacerbation of psychiatric symptoms," could perform other full-time work which exists in the economy and the VE responded, yes.  (R. 58).  The VE stated further that

[a]bsenteeism of one, but not six, say two days per month, and for an

unskilled entry level worker there is often a probationary period [INAUDIBLE] onset, which would vary for industry and even for employer, but it could be up to three months.  During a probationary period absenteeism for any reason is typically not tolerated.  Beyond one, but definitely no more than two days per month.

(R. 60).  The VE then identified three jobs that Peterson could perform within the limitations set forth by the ALJ, i.e.,  an assembler, a sorter, and a material handler.  (R. 58).  Significantly, contrary to Peterson's contention, the ALJ relied on the VE's testimony because the ALJ explicitly stated that "[b]ased on the testimony of the vocational expert, the [ALJ] concludes that . . . [Peterson] is capable of making a successful adjustment to other work that exists in significant numbers in the national economy."  (R. 25).  In other words, the evidence does not support Peterson's contention that the ALJ failed to properly consider that VE's opinion.

## VI.  Conclusion

Based on the foregoing, the court concludes that the ALJ's determination that Peterson is not disabled is supported by substantial evidence, and that the ALJ applied proper legal standards in reaching this determination.  The final decision of the Commissioner is, therefore, **AFFIRMED**.  A separate order in accordance with this memorandum of decision will be entered.

**Done** the 9th day of July, 2012.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE